20-1956 from the District of Nebraska, Laredo Ridge Wind et al. versus Nebraska Public Power District. Well, the court will hear from Mr. Lambs. Good morning, your honor. Can you hear me okay? I can. The court is presented with two issues this morning. That first issue is, did the admitted delegation by the appellees of the performance of the contract violate the anti-assignment clause of the contract? The second issue is, did the sale first to NRG and later to GIP constitute a sale or transfer of the majority of the ownership interest? In other words, of the facilities. In other words, a change of control. The district court without addressing either the Eighth Circuit President or the Nebraska President held that the delegation of performance did not violate the contract because the wind facilities or entities remained ultimately liable. With regard to the second issue, the district court, rather than first focusing on ownership interest and determining what the parties meant by that phrase, instead held that direct preceding ownership interest modified the contract and made the phrase referred to legal title only. The history of this involvement between the two parties starts in 2007, when Nebraska Public Power District, a political subdivision of the construct, own, operate a wind facility, a wind farm in the state of Nebraska. As the RFP made clear, NPPD was searching for, in effect, a partner with experience in this area. The Edison Mission Energy replied to the RFP. In their reply, in their response, they touted their broad experience and their ability to perform, to construct, own, and operate a wind facility. The RFP, their response also further indicated that affiliates of Edison Mission Energy would be involved in the various aspects of constructing, owning, operating, and performing the contract. The Edison Mission Energy ownership structure was a multi-tiered ownership structure with an unbroken link between the LLC and the upstream entities. The wind facility or the entities themselves had no— Councilman, I've got to ask you, you're dwelling on the facts, your time, but you say unbroken link, wasn't one of these only 22% owned by the upstream? Your Honor, I believe that's a fact issue, because as we indicate in the brief and as the appendix shows, the entities, in this instance, GIP, I can focus on the most current buyer, GIP indicated that they own 67% of Elkhorn and 100% of the other three. Okay, proceed. Thank you for clarifying. Go proceed. That's fine. The contract that they ultimately enter into contains prohibitive transactions. There are basically, it's 10.2.1, and there are three types of transactions that are prohibited and require consent of NPPD. The first one is what is at issue here, and that's the change control provision, although that same A also talked about any consolidation, merger, reorganization, et cetera. At issue here this morning is the change control position, prohibition, I'm sorry. Then B prohibits the facilities or entities from selling or transferring the asset without the permission of the NPPD. And then C, which is at issue here again this morning, signs or prohibits the entities from assigning any rights or obligations under the contract. Counsel, this is Judge Gross. Could you tell us what's ambiguous in the change control provision about the term direct ownership interest? Sure. I think you're right. There are a number of ambiguities, ambiguous phrases. First of all, just the ownership itself, ownership under the plain meaning does not refer to legal title. It refers to possession, use, or control. Secondly, and it's not defined in the contract. Secondly, interest is not defined in the contract. Third, direct is not defined in the contract. So, what you have are a series of three words that are undefined, nor is the, if you put the phrase together, direct ownership interest is not defined. So, the appellees would have us in the lower court said, well, direct precedes ownership interest. So, therefore, it's unambiguous. I beg to differ. I think where the rationale goes off course is it seems to me that the first thing the court should do is determine what are we dealing with here. We're dealing with ownership interest. Well, ownership interest by itself is vague. As I earlier said, it's the right to of the entity. But another ambiguity is that there's more than one reasonable interpretation. So, another, I think, point that goes to the ambiguous nature of direct, majority of the direct ownership interest is the ordinary meaning should apply. Fourth, there are specific terms that could have been used here rather than ownership interest. The entities, the parties could have used membership interest if they met legal title. They could have used LLC's interest or they could have used units. They did not. They purposely chose a term ownership interest. I think a fifth consideration with regard to the ambiguity is the purpose of the provision, and that's to prohibit the change of control. If we accept the appellee's interpretation of change of control, it becomes meaningless because all we have to do is sell an upstream entity. Also, as we point out in the brief, the word interest is plural. It's not interest. It doesn't say ownership interest. And then we do talk about some course of performance. Mr. Lambs, let me ask you about that question. It's my understanding that the project entities here are LLC's. And so, I guess what I'm wondering is, isn't the term direct ownership interest analogous to stock if they were corporations? No, Your Honor, I don't believe it is. I mean, the power here, first of all, with the exception of Elkhorn, there's only one member, and that's the upstream entity. And so, the upstream entity has the right to appoint to basically the right to control, the right to possession, use, et cetera. I think that if they were talking about just ownership interest or akin to stock, the term would have been units, membership interest, like the court in Dole where they found shares modified. That's not present here. Here we have ownership interest, but we don't have unit. We don't have members. We don't have any of the LLC's interest. So, I don't think it is akin to that, Your Honor. Mr. Lambs, the direct, that seems to me to be the key in this case. So, how do you get around that term, or at least my perception of your argument that you're just reading that term right out of the contract? I'm not, Your Honor. I think, again, it goes to, you first have to examine the term ownership interest. What does that mean? So, if it does mean, as we claim, the right to control, then we have to focus on the word direct. So, then, we look at the facts of this case, the right to control is a direct link to the upstream entities. So, in this instance, I believe the word direct refers to an unbroken link to the entity, the parent, that has the right to control. We're not ignoring the word direct, and, of course, I think the common use is, I'm a direct descendant of my great-great-grandfather, that type of analogy. Is it fair to link ownership interest with control? That sounds to me like two different concepts. But, it's in the same paragraph. I mean, that's what they're trying to do, is they're defining change of control by using ownership interest. So, it seems to me that it is, I mean, that's probably the ambiguity in this contract. Could it be more artfully drawn, perhaps? But, what I, I'm sorry, did you have another question? Well, yeah, just a brief question. Is there, was this document jointly prepared, or was it prepared, authored by one party or the other? The record is not clear on that, but I can tell the court, and I think they, I believe, would agree that there was negotiations that went on between, basically, the, I'm going to say, an outside law firm and an in-house law firm for NPPD. There were other people involved, but it was a negotiated contract. It was not, I don't think it would be fair to say that either the appellant or the appellee actually draw the contract. If we can turn for a moment to 10.2.1, it's, which indicates that the seller shall not assign this agreement for any of its rights or obligations without written consent. That's the first issue that, I guess, I presented this morning. If we look at the lower court's opinion, without any citation to any case, without any citation to the restatement or to the Eighth Circuit precedent or to the Nebraska cases, the court basically ignored precedent, ignored the restatements and held that, well, because the it's okay to assign it. I think the law is clear that an anti-assignment clause in a policy, and there's a number of cases that we cite, pertains to the assignment. Mr. Lipson, before you move on to the assignment, can I come back just briefly to the direct ownership interest? If that phrase includes the interests of upstream parent companies, what would an indirect ownership interest be? I think that, and again, it's a little bit confusing in the paragraph itself, but if you know, affiliates refers to in their definition both direct and indirect. And so I think in that definition, what is implied in the way this contract was negotiated, again, the record's not clear because discovery is not over. The actual interpretation of that definition of affiliates, when they're using the word indirect, they're talking about somebody outside the ownership chain. And that's why in there, in the definition of affiliates, they use both direct and indirect, although they use direct twice in that instance. So I believe that what that, the intent of that contract was to allow that disenfranchisement energy to actually contract with an indirect entity. And that would be an would be, I think, is our interpretation of that particular phrase. So if we then turn to 10.2.1, which prohibits assignment of the agreement, any of its rights or obligations, we quote, of course, we decide Zeta Laundry, Omaha Standard versus CRO, I'm sorry, Standard Oil, and Cedar Point, where this court held, quote, is a matter of law that anti-assignment clause refers only to assignment of duties. And it was only during the course of the discovery in this case that the NPPD learned the extension of the extent of what had occurred. What occurs is GIP, which is basically a private equity investor, now owns basically these four entities and through their downstream entities, they're controlling the wind facilities themselves. What has happened is a basically a stranger to this relationship, which we thought we had with EMA. NRG was, of course, bought the case out of bankruptcy. So that's a little bit different. But again, no discovery has been really undertaken with regard to that. Mr. Lambs, the question I have is that if we're not dealing with a personal services contract, isn't there a distinction between assigning a legal obligation and assigning a task? I'm sorry, Judge, would you mind repeating that again? Well, yeah, I'm wondering if the issue here with the language the district court used really doesn't come down to the difference between a legal obligation being assigned and simply delegating the task. I guess I don't read it that way. I mean, if we look at just the law with regard to anti-assignment, it talks about a delegation of the performance of the contract, which is what's an issue here. That's what took place. I don't know that there's an assignment per se of the obligation, I guess, the way you're using the word. Well, counsel, let me follow up with the case in the Nebraska case. Berneson makes that distinction, doesn't it? Well, yeah, but Berneson is an attorney. Yeah, but the black letter law in Arkansas, sorry, wrong state, in Nebraska, the black letter law in Nebraska is you must distinguish between the assignment of contractual rights and the delegation of the performance of a duty. I'm sorry. Sure. So isn't that what Judge Gross was asking? Oh, I think he wasn't. I don't think I was clear on the question. I apologize. No, no, no. It's my question. I didn't mean to throw off on him. Go ahead. What was assigned here was the performance of the contract. I mean, that's what was assigned was the performance of the contract. And not the performance of a duty within a contract. It's a performance of a duty within the contract without assigning the contract itself. In other words, it's a performance of a duty. I read Berneson, Judge, maybe I'm writing differently than you do. I read Berneson to simply say that if they'd assigned the performance of the legal fees, not fees, of the legal tasks, that would be a prohibitive assignment of performance. But here they didn't, in Berneson, they didn't assign the obligation to perform legal services, which is what here, what's assigned in this case, the obligation to perform the contract. In Berneson, they assign the right to collect. That's not what's been assigned here. What's been assigned here were the duties of the performance of the contract, all of them, whether it's to operate, maintain, or whatever it might be. So I don't think, in honor with respect, I don't believe that Berneson applies in this instance. I think you have to go back and you have to refer to the restatement. And I think it's important to point out to the court, this is not a commodity contract. This is what, remember what the court said was, citing that illustration in the restatement, that this was basically an A to B. This wasn't a purchase agreement. This was a 45-page contract, et cetera. So absent further questions, I see I'm writing into my rebuttal time. So with the court's permission, I'm going to end here and I'll be fine. Mr. Davidson, the court will hear from you. Good morning, your honors. I'm Steve Davidson, appearing here on behalf of the four wind operating companies, Laredo Ridge, Cropton Bluffs, Broken Bow, and Elkhorn Ridge. The district court, in this case, correctly found that NPPD's consent was not required for transfers of indirect ownership interests in upstream parent entities by a provision that required consent only for transfers of direct ownership interests. The district court also correctly found that those same transactions involved no assignment of the power purchase agreement or any of the rights or obligations under it. And without an assignment, consent to the transactions was likewise not required. The outcome on those issues, both of them, was driven by the district court's conclusion that the contract terms that issue governing the conclusion on those issues are unambiguous, which made disposition of these issues appropriate on summary judgment, because in Nebraska, extrinsic evidence is not admissible to alter the terms of an unambiguous agreement. And as a result, the district court's issuance of a permanent injunction against NPPD's threatened termination of these 20-year agreements when wrongful termination would cause obvious irreparable harm through the loss of the company's sole revenue streams was needed to avoid that irreparable harm and should be affirmed. I'm going to start on the direct ownership interest issue. The district court correctly found that there's only one reasonable meaning of that phrase, and that derives from the fact that the law, starting in Dole at the Supreme Court and going really throughout state and federal courts, distinguishes between direct and indirect corporate ownership. What NPPD asks you to do here to ignore that distinction is to isolate words from their word means in that isolated sense. That violates a very well-established principle of contract instruction, which is that you interpret the phrase in the context in which it's used. And interestingly, the result of this isolation and deconstruction is essentially to change the meaning of the phrase to its opposite, to say that direct now becomes indirect. And that's simply not what was intended. And the best indication of that intention, I would suggest, is the remainder of paragraph 10.2.3, where this phrase direct ownership interest is found. If you read through the rest of that definition of capital C change control, what you find are a series of exceptions that relate to a variety of circumstances like death of an owner or lien enforcement, things like that. One of those exceptions is transfers to affiliates of Edison Mission. And there is a definition at the bottom of that paragraph that applies to what an affiliate means. And it tells us that NPPD knew very well how to describe indirect ownership or changes based on control rather than the membership interest of the entity itself. That last clause talks about control, small c, means possession directly or indirectly of the power to direct or cause the direction of the management of the policies of the entity, whether through ownership interest by contract or otherwise. A very comprehensive definition of an indirect relationship between two parties. The fact that that language is used in the very same provision as the operative phrase for us, which is transfer of a majority of the direct ownership interest in sellers, tells us that the parties understood the difference when they and all these different entities are affiliates of Edison, right? Of course not. They are not. They are. OK, well, then that doesn't make your exception irrelevant to this case. The exception is irrelevant other than the fact that it includes a use of the phrase direct or indirect to describe something different than what's at issue in this case. What that tells us is that the parties knew what to say in the first sentence of the paragraph if the parties intended that same broader conceptual description of what a change of control is. Instead, in the first sentence, the party said direct ownership interest in seller. That is a very precise, unambiguous description that triggers this consent obligation only in this case when the membership interests of the LLC are being sold. And here, that didn't happen. What happened was a transfer of ownership, multiple tiers up in the upstream ownership of these companies. The other way... So if you put in enough shells between the top one and the bottom one, there's never a direct, right? You can create one up that covers all four of these and there'd never be direct. How do you answer that? Sure. So first of all, there's no indication in this instance that any of these relating to the use of tax credits that apply to renewable energy, to the consolidation and syndication of multiple projects for financing purposes. There are very specific reasons why this corporate structure is in place. Councilman, don't forget the rest of your answer, but is this in the record what you just told us? You bet it is. Okay. Now proceed with the rest of your answer. Sorry, I interrupted you intentionally. So to say that the purpose of this clause can be manipulated in some way by creating entities for no reason, as you suggest, if that were to happen, the law would permit its unwinding so that the actual nature of the transaction would be enforced. And what that does is take you to another concept here, which is that what NPPD is trying to do in connection with its position on this issue is collapse the corporate structure and essentially pierce the veil without proving any of the things like fraud, insolvency, impropriety, et cetera, that would be necessary to ignore those very purposeful corporate differences that were put in place for very legitimate reasons in this instance. I want to talk about for a minute about this argument that this is a meaningless provision. It is not. It has a very specific meaning negotiated purposefully because it allows flexibility to the seller entities to engage in transfers of indirect ownership. That's why it in these two transactions at issue here, it's common in this industry for upstream changes of ownerships involving multiple hundreds of facilities and multi-billion dollar transactions between market entities that obviously know what they're doing or they wouldn't be spending two billion dollars for a renewable energy portfolio. And to suggest that NPPD was sophisticated enough to understand that marketplace when it entered into this agreement and understand that it was purposefully allowing those kinds of transactions to happen without its consent because consent was not necessary to assure ongoing competent performance of the facilities tells you what the real purpose was. On top of that, I would suggest that even the more limited prohibition against transfers of direct ownership interests has value to NPPD because it keeps the contracting entities aligned and in privity with each other. And for example, the briefs talk about how there's this purchase option that NPPD has in year 11 of the contracts when the tax credits expire. It's an option that only can be completed if both sides were to agree to price. But to say in the contract that you can't allow changes of ownership of the project entity itself makes sense because it was necessary to have that for that purchase right to have privity in place so that that purchase right could be honored and enforced once we get to year 11. Lots of reasons why as just an example, but a prohibition that keeps contracting entities aligned is a value in itself. I would suggest the real purpose here was something broader and was very intentional. Let me talk then about this assignment issue. And then the answer is really pretty simple and I think it's where the district court went. Where's the assignment? There is none. Nothing that happened in any of these transactions constituted an assignment of the power purchase agreement or of any rights or obligations under it. And the existence of, I'm sorry. My understanding of the argument though is that it's not the control issue, the transactions involving that. It's hiring outside parties, outside companies to maintain and operate the wind facilities. I think that's accurate. First off, let me start with the contract talks in terms of assignment of obligations. Isn't that just an perhaps inartful way of saying assignment of duties? Not at all, your honor. When the contract talks about rights and obligations, rights would be what comes to the project companies from NPPD, in this case money. And the question is, can we assign? And remember, an assignment is a transfer of a present interest in the subject matter. So the question is, are we going to, as an entity, transfer our interest in the right to receive money to somebody else? Obviously, we're not talking about that here. That's not the side we're talking about. We're talking about the obligation to run and maintain the wind farms. Agreed. So the second piece of it is then obligations. What that describes is the entity's obligation to perform that it owes to NPPD. And these contracts haven't changed that at all. If the wind facilities, the turbines don't run when they're supposed to, the project companies will be obligated for that breach to NPPD. That's where NPPD still looks for that performance. Let me ask you further about that. It's my understanding that the project entities have no employees. How does that impact the analysis? And did NPPD know that they had no NPPD? From the start, that was always the concept here, is that the employees would be upstream, starting with EME and continuing throughout. What's important to remember is that the project companies do have officers. Three of the four of them are single-member, member-managed LLCs. The member has appointed officers. Those officers have authority to execute contracts. With Elkhorn, there are two unaffiliated members with a management committee that does the same. The contracts that have been executed are, for example, a warranty contract with Vestas, the external company that manufactures the turbines. So that warranty contract has all sorts of mutual obligations in it. Vestas has performance standards it's obligated to, which the project companies can enforce if they're not complied with. There are, for example, a variety of reporting obligations that are owed by the warrantied manufacturer back to the project entities. Nothing about that contract is an assignment of legal obligations that the seller under the PPA, the project companies, owe to NPPD. Vestas owes no duties to NPPD as a result of that warranty contract. If this really was an assignment, those are the kinds of issues you would look at. The same is true with the servicing and operation and maintenance contracts that these affiliates have in place. The difference, I suppose, is that they're with an upstream affiliate instead of with an outside third party, but they're still the same kind of agreement. I'd encourage you to look at one. Page 601 of the appellant's appendix is a good example. Those contracts describe a lengthy description of mutual rights and obligations between two parties rather than a transfer of a present interest in a subject matter. The project company under the O&M agreement, specifically the Laredo one, which is a good example, the project company retains significant supervision and authority over performance of those duties through its officers, which are appointed by its member. There are, again, detailed performance standards, budgeting approvals. The affiliate O&M operator cannot spend more money than is authorized by the project entity in its budget. There are indemnification obligations, termination rights upon breach, and importantly, significant limitations are placed on the affiliate operator's authority to act on behalf of the company. It can't change contracts, it can't pledge assets, it can't settle a claim, and as I said, it can't spend money unless it's been authorized by the officers of the operating company to do so. That's not an assignment. Can I come back to my earlier question? Don't the Zetterland and the City of Omaha cases essentially hold that a prohibition on the And I would suggest that if you look at your Cedar Point case in the Eighth Circuit, there's language that similarly says that. The difference here is that each of those cases involved a situation where there had been an assignment in the first place, an actual document that says, we assign this contract to you. And then the question is, what is that? Because it walks like a duck and talks like a duck. It doesn't have to be labeled assignment, right? I agree. And that's why what I just went through in terms of the features of these contracts looks nothing, feels nothing, is nothing like an assignment. And the Brandywine Panda case is a good example of that, because in that case, there were contracts where the power company basically, and I can give you the language that was used, extinguished the right to performance from the original obligor, and that right was transferred. And the language that was used was something like an irrevocable and unconditional appointment of the new operator as the exclusive agent for all purposes without any monitoring or control. That sounds a lot like an assignment, and that's what the court ultimately said, is you've assigned duties and the contract there's a lot of mutuality in there with no stated intention or effective outcome of assigning obligations under the contract. Correct me if I'm wrong, but don't they effectively assign the duty of operating and maintaining the wind farms? They do not. They engage a vendor to always stayed with the project company. That's where the duty to NPPD exists, and the fact that the project company has hired affiliate or non-affiliate. And in fact, if you look in the record, there's a hundred contracts to do different things. You got somebody to shovel the sidewalk, mow the grass, all the way up to various technical things relating to maintenance of the blades on the turbine. It's a long array of different tasks that we have contracted with various parties that have the expertise to do that to complete while retaining the contractual obligations to NPPD within the part with the party that signed the contract with NPPD. That's where the assets that produce electricity exist. That's where all of the money changes hands, where all the legal responsibility exists. That is not an assignment. And the details of those contracts, if you look at them and you compare that to the definition of assignment under Nebraska law, which is transfer of a present interest, it's not what was done. I want to mention one thing before my time runs out on the personal services issue. There are situations, and this is one of them, where that issue can be decided as a matter of law and summary judgment. And the reason is that it's driven in this case by within the four corners of the contract itself. You can tell from reading the contract and looking nowhere else that this relationship was not one driven by personal characteristics of any individual or even any corporation. If NPPD is right on their theory on this, anytime you, in a commercial setting, a contracting party tries hard to get a highly competent contracting party on the other side, that always happens. And the law is not that public policy violates the right to assign any time you take care in who you choose as your contracting party. The question is, would a second competent contracting party, would performance from that person look the same? And here it does, because what performance is, is electricity going to NPPD from a well-operated wind facility. And when two competent operators produce that same outcome, personal service is not an issue. We would ask that the case be affirmed. Summary judgment was appropriate. Thank you for your time. Thank you, Mr. Davidson. Mr. Lamson, your rebuttal. You'll need to unmute your microphone, please. I'd like to begin with the restatement of contracts, specifically section 322. To refresh all of our recollection, it provides that unless the circumstances indicate the contrary, a contract term prohibiting assignment, we have that in this instance, of the contract bars only the delegation to an S&E of the performance by the S&R of a duty or condition. As I understand the appellee's argument, they're saying it must be a written delegation. So they're in effect saying, well, we can avoid this anti-assignment. We can go ahead and delegate as long as we don't do it in writing and officially delegate. It's clear in this case that delegation... I don't think they're saying that. I mean, they're saying there's written contracts. They're just saying it's not an assignment. I think we're saying the same thing in effect. And yes, there are written contracts, but they're saying that the obligation is always going to remain with the entity itself. And that's true. That's under 10.2.4, that they're always going to be ultimately responsible. But here, what's the law? The law is if you've got an anti-assignment clause and you're going to mean something, and if the law is that an anti-assignment clause means you cannot delegate the obligation to operate and maintain without consent, then this anti-assignment clause has been violated because clearly the entity has no employees and all of the obligations to operate and maintain have been delegated to upstream affiliates. Did NPP know that at the beginning? Sure, they did. They knew that, and they knew that was going to happen. But then what happens is NRG comes and buys it out of bankruptcy, and GIP comes in, and then what takes place here? What takes place is the management of each of the LLCs has now changed. The entity that can appoint the management has now changed. The ownership of the upstream companies has now changed. The performance of the contract is no longer in the picture at all. So what we have is a complete change of what NPPD thought it was bargaining for. And if you look at the contract in its entirety and read the contract as a whole, it's clear that NPPD was attempting to retain the right to consent to certain things. One of the reasons, of course, is if we look at they do have an option. They also have a right of refusal. They have an interest in it. They have a public or fiduciary duty to provide electricity. So the who is important in this contract more so than, say, a purchase order. Mr. Lipscomb, let me make sure I understand your argument. It sounded to me like you just said that your client fully understood that these entities would assign the duties to upstream entities. Your only complaint now is that these are owned by different entities. Do you really have an assignment violation here? Sure, you do. Because what we knew at the time was that the upstream affiliates were going to be involved in the performance of the contract. In fact, that was what took place. But those entities were not involved. Isn't that what you're arguing now, an assignment of the duties? It's an assignment of the obligation to operate and maintain. It is, and that's well within what the restatement says, that if there is an anti-assignment clause, you can delegate the duties. You can delegate the duty to operate and maintain unless there's a prohibition that prohibits it, to which we have in this case, or unless it's against public policy. I see that my time has expired, Your Honor. So we'd ask that the court, I think this case can be remanded to the trial court. First of all, that there's been a violation of the anti-assignment clause and the affirmative defenses of the affiliate should be tried in court. Secondly, that the contract is ambiguous with regard to ownership, majority ownership interest, and the jury should determine that ambiguity. Thank you, Your Honor. Counsel, the court appreciates your appearance and arguments today. Interesting case. We'll take it under submission and issue an opinion in due course.